In re BCE WEST, L.P., et al, Debtor,

Einstein/Noah Bagel Corp., Appellant,

v.

Gerald K. Smith, Appellee.

No. 01–16724.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 2002.

Filed Feb. 14, 2003.

Amar S. Bhachu, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for the appellant.

J. Henk Taylor, Lewis & Roca LLP, Phoenix, AZ, for the appellee.

Before: BERZON, TALLMAN, Circuit Judges, and MILLER,* District Judge.

* Honorable Jeffrey T. Miller, United States District Judge for the Southern District of California, sitting by designation.

## OPINION

TALLMAN, Circuit Judge:

This is an appeal from the Bankruptcy Court and the Bankruptcy Appellate Panel ("BAP") involving the interpretation of the administrative priority given to an obligation under a sublease of commercial property. Appellant, Einstein/Noah Bagel Corporation ("ENBC") argues that it is entitled to administrative priority for its claims against trustee Gerald K. Smith under 11 U.S.C. §§ 365(d)(3) and 503(b)(1)(A). We hold that ENBC is not entitled to priority because section 365(d)(3) is not applicable to debtors who are lessors. We also hold that ENBC is not entitled to priority under section 503(b)(1)(A) because its administrative claim did not arise from a post-petition transaction and conferred no benefit on Boston Chicken Inc.'s ("Boston Chicken") estate.

I

ENBC is a stock retailer of bagels and associated foods, and Appellee Boston Chicken is a purveyor of home-style meals. Boston Chicken owned half of ENBC's outstanding shares. In 1996, the two companies entered into various agreements relating to the operations of ENBC. One of these agreements was a five-year lease under which ENBC subleased from Boston Chicken space in the office building where Boston Chicken maintained its headquarters. Boston Chicken, in turn, was leasing the entire building from the Prudential Insurance Company ("Prudential").

Boston Chicken and ENBC amended the sublease agreement in May 1998. The amended sublease included a provision requiring Boston Chicken to use its best efforts to obtain a non-disturbance agreement from Prudential. Such an agreement would prohibit Prudential from disturbing ENBC's rights under the sublease

in the event that Boston Chicken defaulted on the master lease with Prudential. ENBC sought to ensure that its tenancy would be undisturbed because it contemplated a significant expenditure to improve its corporate computer operations at the subleased location.

In October 1998, Boston Chicken, along with its affiliates, filed a Chapter 11 Petition. According to ENBC, during the time leading up to the filing of Boston Chicken's bankruptcy petition, Boston Chicken had been unable to consistently perform its contractual obligations to ENBC. Boston Chicken had also failed to obtain the desired non-disturbance agreement from Prudential. As a result, ENBC asserts that it took steps to ensure its own survival in the event that Boston Chicken abandoned its contractual obligations. To avoid the perceived risk of disruption of its operations, ENBC relocated its headquarters at the end of 1999. ENBC claims that the moving expenses, coupled with accounting costs, amounted to approximately $1.5 million.

In March 2000, Boston Chicken moved for an order authorizing rejection of the ENBC sublease pursuant to 11 U.S.C. § 365. Without opposition by ENBC, the bankruptcy court approved the request the following month. Boston Chicken was deemed to have rejected the ENBC sublease upon the filing of the motion under the terms of the bankruptcy court's order.

In May 2000, Boston Chicken's third amended plan for the bankruptcy estate was approved. The plan provided for the sale of most of Boston Chicken's assets to a subsidiary of the McDonald's Corporation. The plan also provided for the appointment of a plan trustee, Gerald K. Smith, whose duties included the collection, administration, and distribution of Boston Chicken's sale proceeds as well as any retained assets.

Before Boston Chicken's plan was approved, ENBC filed a "Request for Payment of Administrative Expense." ENBC asked for payment of three separate claims, the largest of which was the claim for $1.5 million that alleged Boston Chicken had not used its best efforts to obtain the nondisturbance agreement from Prudential. ENBC asserts that Boston Chicken's breach caused it uncertainty regarding the continued occupation of its offices, thereby forcing ENBC to incur relocation costs.

The bankruptcy court granted summary judgment on the trustee's objection to ENBC's claims arising from the sublease. The only issue addressed in the bankruptcy court's order was whether section 365(d)(3) applied to debtor lessors. The bankruptcy court determined that the plain language of section 365(d)(3) was ambiguous, but that the statute's legislative history, as well as the overall purpose served by the Bankruptcy Code, favored an interpretation limiting the application of that section to debtor lessees. The bankruptcy court's final appealable order stated that ENBC was "not entitled to administrative priority under 11 U.S.C. §§ 503(b),[1] 365(d)(3) or any other provision of the Bankruptcy Code."

On appeal, the BAP likewise determined that ENBC's claim relating to the sublease was not entitled to administrative priority. The BAP upheld the bankruptcy court's construction of section 365(d)(3) as inapplicable to debtor lessors, and then went on to resolve ENBC's section 503(b)(1)(A) claim. The BAP determined that ENBC was not entitled to administrative priority under section 503(b)(1)(A) because ENBC had not conferred a substantial benefit on Boston Chicken's bankruptcy estate.

ENBC appeals the BAP's order. We have jurisdiction pursuant to 28 U.S.C. § 158(d).

## II

■ We examine the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir.2002). Mixed questions of law and fact are reviewed de novo. *See id.* Decisions of the BAP are reviewed de novo. *Id.* We also review de novo the bankruptcy court's interpretation of the Bankruptcy Code. *Id.; see also Staffer v. Predovich (In re Staffer)*, 306 F.3d 967, 970–71 (9th Cir.2002).

■ Section 365(d)(3) of the Bankruptcy Code provides in pertinent part:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.... Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under the title.

Whether section 365(d)(3) applies to debtor lessors is an issue of first impression in this circuit. ENBC argues that the plain text of section 365(d)(3) is clear: it applies to any lease to which the debtor is a party, not just to leases under which the debtor is the lessee. The trustee, on the other hand, argues that the last sentence of section 365(d)(3) indicates that it applies only when the debtor is a lessee.

■ Our analysis under the general rules of statutory construction begins with

---

**1.** The bankruptcy court did not actually address the application of section 503(b)(1)(A), finding that "ENBC does not claim traditional administrative claim priority under section 503(b)." On appeal, the BAP concluded that ENBC did make such a claim and then resolved the claim in favor of the trustee.

the language of the statute itself. *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir.2002) (en banc). "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair Enters.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). But "[w]here the language is not dispositive, we look to the congressional intent revealed in the [legislative] history and purposes of the statutory scheme." *Buckland*, 289 F.3d at 565. Statutory construction of the Bankruptcy Code is "a holistic endeavor" requiring consideration of the entire statutory scheme. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

While the first sentence of section 365(d)(3) does not exclude the possibility of its application to debtor lessors, the last sentence limits its application to those situations where the debtor is the lessee. The statute's final sentence addresses only the *"lessor's rights"* under *"such lease" agreements*, referring back to the lease discussed in the first sentence. These sentences should be read together to determine the meaning of the statute. *See United Sav. Ass'n of Texas*, 484 U.S. at 371, 108 S.Ct. 626 (cautioning that the Bankruptcy Code must be read holistically); *cf. Deal v. United States*, 508 U.S. 129, 133, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) (interpreting the word "conviction"

in 18 U.S.C. § 924(c)(1) by reference to other sentences in the same section). Taken together, section 365(d)(3)'s first and last sentences indicate that the section applies only when a lessor is accepting performance from the debtor lessee.

The statute's legislative history confirms our holding that section 365(d)(3) applies only to lessees. We have previously determined that the purpose of this statute—to "ensure immediate payment of lease obligations so that the *landlord* is not left providing uncompensated services"—is "evident from the legislative history of the section" and from the statements made by Senator Hatch during consideration of the bill amending the statute.[2] *Cukierman v. Uecker (In re Cukierman)*. 265 F.3d 846, 850–51 (9th Cir.2001) (emphasis added); *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401, 403 (9th Cir.1994). Other courts have also relied on Senator Hatch's comments in finding that section 365(d)(3) was enacted to protect the interests of landlords. *See Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205, 210 (3d Cir.2001) (finding that "[v]irtually all courts have agreed that [section 365(d)(3) ] was intended to alleviate ... the burdens of landlords by requiring timely compliance with the terms of the lease."). The language of section 365(d)(3) and its legislative history lead us to conclude that its application is limited to those situations where the debtor is the lessee. In the

---

**2.** Senator Hatch, a conferee on the 1984 amendments, gave a detailed explanation of Congress's reasons for creating section 365(d)(3). Senator Hatch stated:

[T]he landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the

trustee's failure to make the required payments for the debtor.

*See* 130 Cong. Rec. S 8891, 8895 (daily ed. June 29, 1984), *reprinted* in 1984 U.S.C.C.A.N. 576, 598. No Senate Report or House Report accompanied the legislation, nor did the House Conference Report contain a Joint Explanatory Statement. *See* 1984 U.S.C.C.A.N. 576. *See also In re Cukierman*, 265 F.3d at 851 n. 2.

case at bar, the debtor, Boston Chicken, is the lessor. We therefore hold that section 365(d)(3) is inapplicable to ENBC's claims.[3]

## III

ENBC argues that even if section 365(d)(3) of the Bankruptcy Code is inapplicable, it is entitled to administrative priority treatment under 11 U.S.C. § 503(b)(1)(A). We disagree.

■ In classifying the order of payment for creditors' claims, the Bankruptcy Code affords the highest level of priority to "administrative expenses." 11 U.S.C. § 507(a)(1); *Abercrombie v. Hayden Corp. (In re Abercrombie),* 139 F.3d 755, 756 (9th Cir.1998). Section 503(b)(1)(A) of the Code defines administrative expenses and provides a nonexclusive list of allowable expenses including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." *Kadjevich v. Kadjevich (In re Kadjevich),* 220 F.3d 1016, 1019 (9th Cir.2000). "The availability of the priority encourages third parties to deal with a business that has filed in bankruptcy, because these parties will be paid ahead of other creditors." *In re Abercrombie,* 139 F.3d at 757.

■ "The burden of proving an administrative expense claim is on the claimant." *Microsoft Corp. v. DAK Indus.(In re DAK Indust.).* 66 F.3d 1091, 1094 (9th Cir.1995) (internal citation omitted). In order to limit abuses of the administrative-expense priority, we require a claimant to show that the debt: (1) arose from a transaction with the debtor-in-possession and (2) directly and substantially benefitted the estate. *In re Abercrombie,* 139 F.3d at

757. "Critically ... only *post-petition* debts can be treated as administrative expenses; *pre-petition* debts may not be granted administrative-expense priority." *In re Kadjevich,* 220 F.3d at 1019 (emphasis in original).

### A

■ Whether an alleged breach of contract for failure to seek a non-disturbance agreement—which ultimately resulted in alleged post-petition damages—is entitled to administrative-expense priority has not yet been decided in this Circuit. Application of our established case law, however, leads us to the conclusion that the source of ENBC's claim arose pre-petition and therefore is not entitled to administrative-expense priority.

*In re Kadjevich* rejected a creditor's claim that attorney's fees awarded as the result of a pre-petition state-court fraud action were entitled to post-petition administrative-expense priority. *Id.* at 1020. In that case, Nicholas Kadjevich sued his brother, Robert, for fraud arising from Robert's alleged breach of a settlement agreement. While the fraud action was pending in state court, Robert Kadjevich filed a petition for relief under Chapter 11. The brothers settled the fraud action as part of an effort to settle the bankruptcy estate, but after Robert again breached the settlement order, Nicholas sought and obtained a state-court judgment that Robert had engaged in fraud. The state court awarded Nicholas damages and attorney's fees. *Id.*

Nicholas requested that the attorney's fees award be classified as an administrative expense entitled to priority in Robert's bankruptcy estate. We rejected Nich-

---

**3.** Because we find that section 365(d)(3) is inapplicable, we do not address Boston Chicken's arguments that ENBC's contractual obligation did not arise pre-petition for the purposes of administrative priority under section 365(d)(3), or that section 365(d)(3) does not apply to nonmonetary lease obligations.

olas's argument, which distinguished between pre-petition and post-petition conduct. Instead, we found that "the fact that Robert did not engage in the particular misconduct that caused the fees to be awarded until after he filed his bankruptcy petition does not change the fundamentally pre-petition nature of the fraud action. . . ." *Id.* at 1020. In *Kadjevich,* we concluded that "the 'source' of the award of attorney's fees [was] the pre-petition state-court fraud action. . . ." *Id.*

In reaching our decision in *Kadjevich,* we relied on our earlier holding in *In re Abercrombie,* 139 F.3d 755 (9th Cir.1998). *Abercrombie* likewise rejected a claimant's attempt to classify his claim according to the debtor's post-petition conduct. Instead, we evaluated the claim by looking to the source of the obligation. 139 F.3d at 759. Because "the source of the estate's obligation remain[ed] the pre[-]petition fee provision," we determined that the claimant's expense arose prepetition and was not entitled to administrative-expense priority. *Id.*

We have also applied the source-of-the-obligation analysis to cases outside of the attorney's fees context. In *DAK Indus.,* we concluded that an agreement to make installment payments on a software licensing agreement was not entitled to administrative expense priority, although installment payments were made post-petition. 66 F.3d at 1095. We reasoned that because the entire debt arose pre-petition, and because the parties' rights and responsibilities were set pre-petition, the contract giving rise to the claim must be considered to have arisen pre-petition and was therefore not entitled to priority. *Id.* at 1095–96.

Here, despite ENBC's claims that the conduct giving rise to the breach of contract arose after Boston Chicken filed its petition, the source of the obligation was the amended sublease agreement. Like the attorney's fees in *Kadjevich* and *Abercrombie,* and the contract in *DAK Indus.,* any potential damage award to ENBC must be based on the obligations set by the parties in the pre-petition sublease. Because the contractual obligation arose pre-petition and the contract was not assumed by the debtor, any damages that may be ultimately awarded to ENBC are not entitled to administrative-expense priority.

**B**

ENBC's claim is also not entitled to administrative priority because it fails to show that it substantially benefitted Boston Chicken's bankruptcy estate. The Bankruptcy Code states that administrative priority will only be accorded to claims involving "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The terms "actual" and "necessary" are to be construed narrowly and "must be the actual and necessary costs of preserving the estate for the benefit of its creditors." *N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 706 (9th Cir.1988).

ENBC argues that it conferred substantial benefits on Boston Chicken after the commencement of Boston Chicken's Chapter 11 Petition by making contractual payments of more than $5 million, rent payments of more than $300,000, and by paying its share of taxes, operating expenses, and insurance on the leased property. According to ENBC, Boston Chicken took the benefits conferred by ENBC but did not fulfill its obligation to seek a non-disturbance covenant, instead choosing to look at alternative ways to dispose of its leasehold interest.

The BAP did not err in determining that ENBC conferred no benefit on Boston Chicken's post-petition estate. While

ENBC continued to pay its rent and related expenses, those costs were attributed to ENBC's continued use of the leased premises. The $1.5 million relocation expense that is the subject of ENBC's administrative petition benefitted only ENBC and conferred no benefit on Boston Chicken's estate.

There was no error in denying the claim.

**AFFIRMED.**