**In re John PAK, Debtor.**

**John Pak, Appellant,**

**v.**

**eCast Settlement Corporation; American Express Centurion Bank; Martha Bronitsky, Trustee; United States Trustee, Appellees.**

**BAP No. NC–07–1201–DCaK.**
**Bankruptcy No. 05–49326.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Oct. 26, 2007.

Filed Nov. 7, 2007.

Cathleen Cooper Moran, Moran Law Group, Inc., Mountain View, CA, for John Pak.

Michael H. Meyer, Santa Rosa, CA, for Martha Bronitsky, Trustee.

John M. O'Donnell, Law Offices of John M. O'Donnell, Sacramento, CA, for eCast Settlement Corp.

Before: DUNN, CARROLL,[1] and KLEIN, Bankruptcy Judges.

## OPINION

DUNN, Bankruptcy Judge.

In this appeal, we address one of the most perplexing issues that has arisen in chapter 13 under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")—interpretation of the term "projected disposable income" in § 1325(b)(1)(B).[2] The debtor, John Pak ("Pak"), whose "disposable income" under the statutory definition was less than one third of his actual net income available to pay creditors, appeals the bankruptcy court's order dismissing his chapter 13 case after denying confirmation of Pak's amended chapter 13 plan. We AFFIRM.

## I. FACTS

The factual background is not in dispute. Pak is a software engineer. He was laid off from his employment in April 2002 and did not find new employment until August 2005, approximately 39 months later. During the period that he was unemployed, Pak lived on savings, unemployment benefits and distributions from his 401K plan. He also accumulated substantial unsecured debt.

Since August 2005, Pak has found work in his field as a software engineer, but as a "contract worker through a job shop," with no health insurance or other benefits. His gross compensation is $8,666.67 per month, for a total of $104,004.04 per year.

On October 31, 2005, Pak filed a voluntary chapter 7 petition. His original schedules of income and expenses (Schedules I and J) showed net take home pay of $5,530.20 per month and expenses of $3,718.00, leaving a net monthly income of $1,812.20. Pak listed general unsecured claims totaling $172,931.24 in his Schedule F.

Pak filed an Official Form 22A ("Form 22A"), on which chapter 7 debtors calculate "current monthly income" under § 101(10A) and monthly expenses recognized under § 707(b)(2).[3] Since § 101(10A) requires that current monthly income be calculated historically, based on average gross income received during the six-month period ending with the month prior to the month during which his bankruptcy petition was filed, the "current monthly income" on Pak's Form 22A ($2,666.67 monthly, and $32,000.04 annually) was less than one third of his actual income at the time of his bankruptcy filing, because Pak was not employed during four of the six months of the relevant period. All parties agree that Pak's annualized "current monthly income" was below the median income for a California household of one person.

On April 14, 2006, the United States Trustee ("UST") filed a motion to dismiss

---

1. Hon. Peter H. Carroll, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all "Code," chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101–1532, as amended by BAPCPA, Pub.L. 109–8, 119 Stat. 23, as the case from which this

appeal arises was filed after October 17, 2005, the effective date of most BAPCPA provisions.

3. Form 22 was known as Form B22 in the interim preceding the effective date of the official Forms. Some jurisdictions continue to refer to the official Form as Form B22.

("Motion to Dismiss") Pak's chapter 7 case as an abuse under § 707(b)(3). On May 18, 2006, the bankruptcy court granted the Motion to Dismiss in a published decision, *In re Pak*, 343 B.R. 239 (Bankr.N.D.Cal. 2006). Pak filed a Motion to Convert Case to Chapter 13 on May 26, 2006, which the bankruptcy court granted on May 31, 2006.

Pak filed amended Schedules I and J ("Amended Schedules I and J") and a chapter 13 plan on June 26, 2006. Pak's Amended Schedules I and J reflected net take home pay of $5,411.89 per month and expenses of $4,421.99, with a balance of $989.70 net monthly income. Pak's proposed chapter 13 plan provided for payments of $300.00 a month for 36 months. On August 1, 2006, Pak filed an amended chapter 13 plan ("Amended Plan"), proposing payments of $300.00 a month for 35 months, with a final payment of $322.20 in month 36. Pak's proposed payments under the Amended Plan would total $10,822.20. If Pak made chapter 13 plan payments based on his net monthly income, as reflected on his Amended Schedules I and J, his payments would total $35,629.20 over the life of a 36 month plan.

American Express Centurion Bank and eCast Settlement Corporation (collectively, the "Objecting Creditors"), the Trustee, and the UST each objected to confirmation of the Amended Plan, arguing that the Amended Plan failed to commit all of Pak's "projected disposable income" to payment of unsecured claims. Pak countered that the Amended Plan met "the requirements of § 1325 in that more than his statutory disposable income for 36 months [was] committed to the plan."

After giving the parties opportunities to brief the issues and hearing oral argument, the bankruptcy court issued its memorandum of decision on December 14, 2006, published at 357 B.R. 549 (Bankr. N.D.Cal.2006), sustaining objections to and denying confirmation of the Amended Plan. The bankruptcy court entered an order denying confirmation of the Amended Plan on December 27, 2006.

Pak filed a Motion for Leave to Appeal the bankruptcy court's order denying confirmation of the Amended Plan with the Panel on January 4, 2007, which motion was denied based on the interlocutory nature of the order.

Pak subsequently waived the right to amend further his chapter 13 plan, at which point the bankruptcy court granted the Trustee's motion to dismiss Pak's bankruptcy case. The dismissal order was entered on May 10, 2007. Pak filed his Notice of Appeal on May 17, 2007.

On Pak's motion, the bankruptcy court entered an Order Staying Dismissal Pending Appeal on August 6, 2007.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(L). We have jurisdiction pursuant to 28 U.S.C. § 158.

## III. ISSUE

Whether the bankruptcy court erred in concluding that Pak's Amended Plan was not confirmable, as not committing all of Pak's "projected disposable income" to pay unsecured creditors, as required pursuant to § 1325(b)(1)(B).

## IV. STANDARD OF REVIEW

■ We review issues of statutory construction and conclusions of law, including interpretation of provisions of the Bankruptcy Code, de novo. *Einstein/Noah Bagel Corp. v. Smith (In re BCE W., L.P.)*, 319 F.3d 1166, 1170 (9th Cir.2003); *Mendez v. Salven (In re Mendez)*, 367 B.R. 109, 113 (9th Cir. BAP 2007).

## V. DISCUSSION

■ This appeal raises thorny issues of statutory construction. Since the Trustee and the Objecting Creditors objected to confirmation of Pak's Amended Plan, the immediate statutory battleground is § 1325(b)(1)(B), which provides:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, *as of the effective date of the plan—*
>
> . . .
>
> (B) the plan provides that all of the debtor's *projected disposable income to be received in the applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

4. Section 1325(b)(2) provides:

> For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—
>
> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>
> (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.
>
> The term "current monthly income" itself is defined in § 101(10A) as:

(Emphasis added.)

Pak argues in effect that the bankruptcy court erred in not applying the term "disposable income" as defined in § 1325(b)(2) [4] consistent with its "plain meaning." In Pak's view, the addition of the term "projected" to "disposable income" in § 1325(b)(1)(B) adds a mere multiplier, based on the number of months within the applicable commitment period (in this case, 36 months), to determine the minimum amount that a debtor must pay to his unsecured creditors in chapter 13 in order to satisfy the § 1325(b)(1)(B) condition to confirmation.

■ Statutory interpretation begins with a review of the language used by Congress in the current version of the law.

> (A) . . . the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—
>
> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>
> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
>
> (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

The starting point in discerning congressional intent is the existing statutory text, *see Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438[, 119 S.Ct. 755, 142 L.Ed.2d 881] (1999), and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."

*Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (citations omitted). When the statutory language is ambiguous, however, courts may look beyond the statute itself to its legislative history and common usage of subject terms for guidance as to interpretation, as well as the context in which they are used. "Whether a statute is ambiguous is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Hough v. Fry (In re Hough),* 239 B.R. 412, 414 (9th Cir. BAP 1999) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). *See In re Slusher,* 359 B.R. 290, 295 (Bankr. D.Nev.2007)("In determining the sense of the words Congress chose, it is appropriate to investigate the contexts in which English generally and the Bankruptcy Code specifically employ the same or similar words.").

■ The term "projected disposable income" is not new with the BAPCPA amendments to the Bankruptcy Code. Before BAPCPA, "projected disposable income 'was derived from' income not reasonably necessary for maintaining or supporting the debtor or a dependent, with that determination being made on an estimated basis at plan confirmation." *Id.* at 294. In most cases, disposable income was determined by subtracting the debtor's monthly expenses, as set forth on Schedule J, from the monthly net income stated on the debtor's Schedule I.

Congress changed the determination of "disposable income" in chapter 13 under BAPCPA by adding extended, if not necessarily precise, definitional terms in §§ 1325(b)(2) and (b)(3) [5] and 101(10A). However, Congress did not alter either the term "projected disposable income" in § 1325(b)(1)(B) or the requirement of § 1322(a)(1) that the debtor commit "such portion of *future earnings or other future income of the debtor to the supervision and control of the trustee* as is necessary for the execution of the plan." (Emphasis added.)

A number of courts have followed Pak's reasoning and have concluded that the term "projected" must be mechanically linked to the changed definition of "disposable income," both as a matter of "plain meaning" statutory interpretation and common sense. The definition of "disposable income" in § 1325(b)(2) is expressly limited to § 1325(b) ("For purposes of this subsection, the term 'disposable income'

---

5. Section 1325(b)(3) provides:

Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4.

means …"), but the words "disposable income" appear only at one other place in § 1325(b), as part of the phrase "projected disposable income." This has led some courts to conclude that "[i]f 'disposable income' is not linked to 'projected disposable income' then it is just a floating definition with no apparent purpose." *In re Alexander*, 344 B.R. 742, 748 (Bankr. E.D.N.C.2006). *See, e.g., Coop v. Frederickson (In re Frederickson)*, 375 B.R. 829 (8th Cir. BAP 2007); *In re Kolb*, 366 B.R. 802 (Bankr.S.D.Ohio 2007); *In re Hanks*, 362 B.R. 494 (Bankr.D.Utah 2007); *In re Kagenveama*, No. 05–28079–PHX–CGC, 2006 Bankr.LEXIS 2759 (Bankr.D.Ariz. July 10, 2006); *In re Tranmer*, 355 B.R. 234 (Bankr.D.Mont.2006); *In re Rotunda*, 349 B.R. 324 (Bankr.N.D.N.Y.2006); *In re Guzman*, 345 B.R. 640 (Bankr.E.D.Wis. 2006); *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C.2006).

The bankruptcy court's *Kagenveama* decision provides a typical example of the "plain meaning" analysis applied to "projected disposable income" in § 1325(b)(1)(B):

> Care was taken by Congress to modify the old definition of disposable income and to replace it with one based upon "current monthly income." This is clear; there can be no doubt about it. Section 1325(b)(2) states what the definition of "disposable income" is "for the purpose of this subsection"; nowhere else, other than in Section 1325(b)(1)(B), do the words "disposable income" appear in the referenced subsection. Un-

> less the definition applies to "projected disposable income," it has no meaning.

*In re Kagenveama*, 2006 Bankr.LEXIS 2759 at *5. However, the *Kagenveama* court explicitly recognized the incongruous results from its interpretation of "projected disposable income."

> There are, of course, practical difficulties with the conclusion that "projected disposable income" is necessarily defined by "current monthly income." The most obvious is that historical current monthly income may or may not have any relationship to the actual income to be received by the debtors during the course of their Chapter 13 plan. For that purpose, the previous "I and J" approach would seem to yield a more reality-based number. However, Congress has chosen not to rely on I and J, notwithstanding their proven utility, and that is Congress' choice to make. But this case illustrates the problems caused by this approach. Debtor's Schedules I and J yield "disposable income" of $1,523.89; however, "disposable income" as shown on Debtor's B22C form is a -$4.04. Given the stated purposes of BAPCPA, it is both ironic and unfortunate that this Debtor with resources available to pay unsecured creditors will not be required to do so in this case.

*Id.* at *5–7.

In our view, consistent with the holdings of most courts that have considered the issue,[6] Congress' retention of the term

---

**6.** *See, e.g., In re McCarty*, 376 B.R. 819 (Bankr.N.D.Ohio 2007); *In re Warren*, No. 07–30721–DHW, 2007 WL 2683837 (Bankr. M.D.Ala. Sept.6, 2007); *In re Mancl*, 375 B.R. 514, 516 (Bankr.W.D.Wis.2007)("As this case illustrates, the integration of the means test into the calculation of projected disposable income can hardly be characterized as seamless."); *In re Meek*, 370 B.R. 294 (Bankr.D.Idaho 2007); *In re Knippers*, No.

06–34841–H3–13, 2007 WL 1239297 (Bankr. S.D.Tex. Apr.26, 2007); *In re Mullen*, 369 B.R. 25 (Bankr.D.Or.2007); *In re LaPlana*, 363 B.R. 259 (Bankr.M.D.Fla.2007); *Kibbe v. Sumski (In re Kibbe)*, 361 B.R. 302 (1st Cir. BAP 2007); *In re Gordon*, 360 B.R. 679 (Bankr.S.D.Cal.2007); *In re Riggs*, 359 B.R. 649 (Bankr.E.D.Ky.2007); *In re Slusher*, 359 B.R. 290 (Bankr.D.Nev.2007); *In re Bossie*, No. A06–00432–DMD, 2006 WL 3703203, at

"projected" to modify "disposable income" in § 1325(b)(1)(B) is ambiguous. It does not fit as neatly into the role of mindless multiplier as the "plain meaning" decisions would suggest, for the following reasons.

First, neither "projected" nor "projected disposable income" is defined in the Bankruptcy Code.[7] Yet, the addition of the term "projected" to "disposable income" in § 1325(b)(1)(B) differentiates it from "disposable income," as defined in § 1325(b)(2). To interpret it otherwise tends to rob it of meaning. *See, e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)("Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another."); *In re Jass*, 340 B.R. 411, 415 (Bankr.D.Utah 2006)("the Court must give meaning and import to every word in a statute").

■ The term "projected" is essentially forward-looking. It means "to calculate, estimate or predict (something in the future) based on present data or trends." *Id.* (quoting *The American Heritage College Dictionary* 1115 (4th ed.2002)). It was so interpreted pre-BAPCPA. *See Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355, 357 n. 5 (9th Cir.1994).[8] Treating "projected" as future-oriented also is

---

*1–2, 2006 Bankr.LEXIS 3956, at *4–5 (Bankr.D.Alaska Dec.12, 2006); *In re Casey*, 356 B.R. 519 (Bankr.E.D.Wash.2006); *In re LaSota*, 351 B.R. 56 (Bankr.W.D.N.Y.2006); *In re Demonica*, 345 B.R. 895 (Bankr.N.D.Ill. 2006); *In re Gress*, 344 B.R. 919 (Bankr. W.D.Mo.2006); *In re Risher*, 344 B.R. 833 (Bankr.W.D.Ky.2006); *In re Dew*, 344 B.R. 655 (Bankr.N.D.Ala.2006); *In re McGuire*, 342 B.R. 608 (Bankr.W.D.Mo.2006); *In re Clemons*, No. 05–85163, 2006 Bankr.LEXIS 1366, at *16–17 (Bankr.N.D. Ga. June 1, 2006); *In re Hardacre*, 338 B.R. 718 (Bankr. N.D.Tex.2006).

7. The term "projected disposable income" appears in five sections of the Bankruptcy Code other than § 1325(b)(1)(B), none of which purports to define it. *See* §§ 1129(a)(15)(B), 1222(a)(4), 1225(b)(1)(B), 1225(b)(1)(C) and 1322(a)(4). Several courts and at least one commentator have cited § 1129(a)(15)(B), added by BAPCPA, as evidence for the proposition that "projected disposable income" is nothing more than "disposable income" annualized. *See, e.g., Frederickson*, 375 B.R. 829; *In re Berger*, 376 B.R. 42 (Bankr. M.D.Ga.2007); and Hon. Randolph J. Haines, *Chapter 11 May Resolve Some Chapter 13 Issues*, 8 Norton Bankr.L. Advisor 1 (Aug.2007).

Section 1129(a)(15)(B) provides:
In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—
. . .

(B) the value of the property to be distributed under the plan is not less than the *projected disposable income* of the debtor (*as defined in section 1325(b)(2)*) to be received during the 5–year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.
(Emphasis added.)

Of course, contrary to § 1129(a)(15)(B)'s parenthetical "plain meaning" statement, "projected disposable income" is *not* defined in § 1325(b)(2). It is possible that in drafting § 1129(a)(15)(B), Congress intended to equate "projected disposable income" with a simple multiple of "disposable income," as defined in § 1325(b)(2). Or, it is possible that Congress' use of the term "projected disposable income" in § 1129(a)(15)(B) is simply one more example of the "loose language" with which "BAPCPA is filled," as Pak recognizes. *See* Appellant's Reply Brief, at page 3, lines 18–19.

We agree with the bankruptcy court in *In re Slusher*, 359 B.R. at 297, that none of the provisions of the Bankruptcy Code incorporating the term "projected disposable income" provides definitive guidance as to its interpretation.

8. In *Anderson*, the Ninth Circuit noted that the definition of "project" was "to plan, figure or estimate for the future," quoting *Webster's Ninth New Collegiate Dictionary* 940 (1984).

consistent with the § 1325(b)(1) requirement that its "projected disposable income" condition be applied "as of the effective date of the plan."

Like "projected disposable income," the term "effective date of the plan" is not defined in the Bankruptcy Code, and it has been interpreted differently in the various statutory contexts in which it is used. *See, e.g., In re Fleishman,* 372 B.R. 64, 70–74 (Bankr.D.Or.2007)(*compare* interpretation under § 1325(a)(4) *with* interpretation of the term under § 1225(a)(4)).

In § 1325(b)(1), the most logical interpretation of the "effective date of the plan" is the date of plan confirmation, as a chapter 13 plan is not binding on the debtor and other interested parties until it is confirmed. *See* § 1327(a).[9] If the determination of the debtor's "projected disposable income to be received in the applicable commitment period" is to be made at the time of chapter 13 plan confirmation, which often occurs months after the petition date, it makes little sense to tie that determination exclusively to income information for the period of six months prior to the debtor's bankruptcy filing. In contrast, "disposable income" is calculated historically, based either on the debtor's income during the six full months preceding the debtor's bankruptcy filing, if, as in this case and in most cases, the debtor filed the required schedule of current income on Form B22A or Form B22C, or during the six months preceding the bankruptcy court's determination of the debtor's current income, if the debtor did not file such a schedule. *See* § 101(10A)(A)(i) and (ii).

The BAPCPA legislative history is generally not helpful in shedding light on why Congress should take such pains to add extended definitions for the terms "current monthly income" and "disposable income" in the Bankruptcy Code, while leaving the term "projected disposable income" unchanged. However, the BAPCPA legislative history does make clear that Congress intended to require debtors to "make a good-faith effort to repay as much as they can afford."[10]

Second, the "plain meaning" interpretation of "projected disposable income" takes leave of reality when faced with debtors whose incomes change dramatically, due to a change in employment status or otherwise during the six months preceding their bankruptcies. This is not a one-way ratchet problem: for every debtor whose *increased* income from the "disposable income" calculation would mean money left on the table that otherwise could be paid to creditors, there are debtors whose *decreased* income would effectively preclude their proposing a feasible chapter 13 plan. *See Mancl,* 375 B.R. at 517 ("Blind adherence to the Form B22C for the determination of a debtor's income could lead to arbitrary results based solely on the timing of the petition, potentially penalizing both debtors and creditors unfairly.").

For example, in *Warren,* 2007 WL 2683837, at *1, during the six months prior to the debtor's chapter 13 filing, she received income from three sources: (1) $5,514 a month from her employment by

---

9. Section 1327(a) provides:

 The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

10. BAPCPA Presidential Signing Statement, http://www.whitehouse.gov/news/releases/2005/04/20050420–5.html. *See* 151 Cong. Rec. S2462–02 (Mar. 10, 2005) (statement of Sen. Sessions)("People who need a fresh start under this bill will get one. The people who can pay some of their debts back will have to do that.").

the state of Alabama; (2) $800 a month distributions from her deceased father's estate; and (3) $350 a month for her services as treasurer of the State Employees Grill. However, her services as State Employees Grill treasurer ended the month she filed her chapter 13 case, and the distributions from her father's estate were scheduled to end three months after her bankruptcy filing.

The chapter 13 trustee argued that the debtor's disposable income calculated in her schedule of current income on Form 22C "fixes the debtor's obligation during the life of the plan regardless of a change in circumstances." *Id.* at *2. The bankruptcy court held that the Form 22C calculation created "a presumptive starting point for determining 'projected disposable income' that may be rebutted by evidence of the debtor's loss of a source of income included in that calculation." *Id.* at *2. The bankruptcy court reached that determination based on its conclusion that interpreting "projected disposable income" as irrevocably tied to "disposable income," as defined in § 1325(b)(2), "would produce results at odds with both Congressional intent and common sense," in that it would force a debtor who otherwise was qualified for chapter 13 relief into a plan that clearly was not feasible. *Id.*

Similarly, in *Jass*, 340 B.R. 411, the bankruptcy court faced a situation where the chapter 13 debtors' Form B22C reflected "disposable income" of $3,625.63 per month, but the debtors proposed to pay their unsecured creditors only $790.00 a month in their chapter 13 plan. The trustee objected to confirmation of the debtors' plan, arguing that because the debtors were not proposing to pay $3,625.63 each month to their unsecured creditors, their plan did not satisfy the "disposable income" test of § 1325(b)(1)(B). The debtors argued that

medical problems experienced by Mr. Jass resulted in a decrease in future income from what was set forth in their Form B22C, and they should not be bound by the form's "inadequate representations of their future budget." *Id.* at 414.

The bankruptcy court differentiated the terms "disposable income," as used in § 1325(b)(2), and "projected disposable income," as used in § 1325(b)(1)(B), holding that the word "projected" had independent significance, as being "future-oriented." *Id.* at 415. It determined that the Form B22C calculation was the starting point for the bankruptcy court's consideration of "projected disposable income," but further concluded that the Form B22C number could be rebutted if it "does not adequately represent the debtor's budget projected into the future." *Id.* at 415–16. It underlined its determination as consistent with the fundamental policies of the Bankruptcy Code, reasoning that,

> If § 1325(b)(1)(B) required a debtor to always pay the calculated disposable income amount resulting from Form B22C, the Court would essentially foreclose the potential for bankruptcy relief from a group of chapter 13 debtors who are otherwise eligible for relief.

*Id.* at 417.

The bankruptcy court ultimately concluded,

> Form B22C will always be the starting point for the Court's inquiry into whether the debtor is complying with the "projected disposable income" requirement of § 1325(b)(1)(B). The Court will presume that the number resulting from Form B22C is the debtor's "projected disposable income" unless the debtor can show that there has been a substantial change in circumstances such that the numbers contained in Form B22C

are not commensurate with a fair projection of the debtor's budget in the future.

*Id.* at 418.

 This case presents the opposite face of the same problem: The calculation of current income on Pak's Form 22A is materially reduced by Pak's unemployment during four of the six months averaged into the calculation. Because the term "disposable income" is included within the term "projected disposable income," we agree with the bankruptcy courts in both *Jass* and *Alexander*, 344 B.R. at 748, that the calculated "disposable income" of the debtor must be the starting point in determining "projected disposable income." The standards for determining "disposable income" initially anchor the term "projected disposable income." However, if the interpretation of "projected disposable income" is not to degenerate into absurdity, deriving "projected disposable income" from "disposable income" must be subject to the presentation of contrary evidence before confirmation of a debtor's chapter 13 plan. "Chapter 13 is not some alternative universe where reality dare not intrude." *Mullen,* 369 B.R. at 34. It makes no sense to interpret "projected disposable income," governing debtors' future payments under their chapter 13 plans, as cast in stone by their pre-bankruptcy history, without any opportunity for the trustee, creditors *or the debtor* to offer rebutting evidence as to changed income circumstances before the effective date of the plan.

In addition, treating "projected disposable income" as no more than a multiple of "disposable income" distorts application of the plan modification provisions of §§ 1323 and 1329.[11] Under § 1323(a) pre-BAPCPA, nothing prevented a debtor from proposing a plan modification that would increase or decrease plan payments based upon changes in the debtor's circumstances prior to plan confirmation. Section 1323(a) was not amended by BAPCPA. However, if "projected disposable income" is treated as an unalterable multiple of "disposable income," as defined in § 1325(b)(2), such plan modifications would be prohibited. This, in effect, is the problem that the *Warren* and *Jass* courts were dealing with.

Postconfirmation plan modifications pursuant to § 1329 present a more complex problem. If "projected disposable income," determined as of the effective date of the plan under § 1325(b)(1)(B), is no more than "disposable income" determined from the Form B22A or B22C multiplied by the number of months in the applicable commitment period, is that "projected disposable income" fixed and impervious to modification for the life of the plan? The Fourth Circuit has held that "the doctrine of *res judicata* prevents modification of a confirmed plan pursuant to §§ 1329(a)(1) or (a)(2) unless the party seeking modification demonstrates that the debtor experienced a 'substantial' and 'unanticipated' post-confirmation change in his financial condition." *Murphy v. O'Donnell (In re Murphy),* 474 F.3d 143, 149 (4th Cir.2007)

11. Section 1323(a) provides,
(a) The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of section 1322 of this title.
Section 1329(a)(1) provides,
(a) At any time after confirmation of the plan but before the completion of payments

under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan....

(citing *Arnold v. Weast (In re Arnold)*, 869 F.2d 240, 243 (4th Cir.1989)).

This Panel, following the Seventh Circuit, rejected that position in *Powers v. Savage (In re Powers)*, 202 B.R. 618, 622 (9th Cir. BAP 1996), but concluded that "the circumstances of the debtor's changed financial situation can then be considered in exercise of the court's discretion." *Id.* See *Barbosa v. Soloman*, 235 F.3d 31, 41 (1st Cir.2000); *Matter of Witkowski*, 16 F.3d 739, 744–46 (7th Cir.1994); *Ledford v. Brown (In re Brown)*, 219 B.R. 191, 193–95 (6th Cir. BAP 1998). Although the Ninth Circuit has not ruled on the preclusive effects of confirmed chapter 13 plans, dicta in *Anderson* suggest that at least in 1994, the Ninth Circuit was inclined to the Fourth Circuit view. *See Anderson*, 21 F.3d at 358.

Ironically (and irrationally), if the Fourth Circuit position ultimately were to prevail, and the "plain meaning" courts' interpretation of "projected disposable income" were upheld, the debtor, trustee and unsecured creditors would be precluded from proposing chapter 13 plan modifications pursuant to § 1329(a) in the absence of the debtor's experiencing substantial income changes postconfirmation, while the bankruptcy court would be precluded from considering such changed financial circumstances preconfirmation. We conclude that interpreting the "projected disposable income" provision of § 1325(b)(1)(B) in that way makes no sense.

## VI. CONCLUSION

For all of the reasons discussed above, we conclude that in interpreting "projected disposable income" in § 1325(b)(1)(B), "disposable income," as defined in § 1325(b)(2), is the starting point for determining "projected disposable income," subject to adjustment, based on evidence, to reflect reality going forward. In this case, Pak's disposable income was skewed by four months of unemployment, averaged into the six months' prepetition determination of his current income on his Form 22A. The bankruptcy court appropriately considered the very substantial change in Pak's employment and financial situation following the extended period of his unemployment in determining whether to confirm the Amended Plan and declining to confirm it. We AFFIRM.

KLEIN, Bankruptcy Judge, concurring:

I agree that we should affirm the dismissal of the chapter 13 case that was based on the refusal of a debtor who could fund a $35,000 plan to propose a plan that pays more than $10,822.20. Conceding that the statute makes it impossible to articulate an indisputably correct answer, I would prefer to affirm on a different theory.

### I

The chapter 13 "disposable income" objection-to-confirmation problem is a classic paradox. The emphasis in §§ 101(10A) and 1325(b) on historical income as the threshold for confirming a chapter 13 plan over an objection contradicts the basic premise embodied in §§ 1306(a) and 1322(a)(1) that chapter 13 plans are funded by future income that really exists and runs counter to the only thing that appears to be unambiguous about the 2005 consumer amendments to the Bankruptcy Code: the policy that more debtors should be diverted from chapter 7 liquidations to chapter 13 repayment plans.

### A

Neither the majority's solution of cutting the Gordian Knot by allowing present fact to trump § 1325(b)(2) "disposable income," nor the competing solution of rigid-

ly adhering to a statutory construction of "disposable income" that ignores present fact in a manner that would bar from chapter 13 some debtors capable of paying at least as much as in chapter 7 while (as here) permitting others to pay less than what they could actually pay, is entirely satisfactory. The former, however, has the advantage of being more consistent with the policy of promoting payment through expanded use of chapter 13.

I submit there must be a better solution than cutting the Gordian Knot to achieve a practical common-sense result, instead of applying a rigidly-tunneled vision of § 1325(b) supported by invocations of "plain meaning" that serve as rhetorical devices to bolster unsatisfactory argument for an unpalatable result. In a sense, however, it is a false dilemma because the "either-or" choice does not account for other analyses. If I must choose between the two, then the Gordian Knot solution that has been applied by a substantial number of courts throughout the country fits better with the 2005 policy of increasing payments to creditors than a rigid analysis that offends the policy.

### B

Any solution that will be serviceable in the long term must meet several criteria. First, it must, as in the facts of the present appeal, account for the debtor whose real income available during the life of the chapter 13 plan is greater than § 1325(b) "disposable income." Second, it must also account for the debtor whose real income is less than § 1325(b) "disposable income" but who can pay enough to fund an otherwise confirmable plan. While this second requirement may seem counterintuitive to those who think that no trustee or unsecured creditor would raise a § 1325(b) objection (§ 1325(b) applies only if objection is made) to a plan that is going to pay

more than in chapter 7, the reality is that some unsecured creditors are animated by spite or a sense that they will have greater leverage if they can force a debtor out of bankruptcy.

Finally, our legal tradition requires that a solution must be based on a plausible construction of the language of the statute.

### II

If there is anything "plain" about the "disposable income" portion of the statute, it is that, in context, it is not "plain."

Justice Thomas, writing for a unanimous Supreme Court, has given us the applicable rule of statutory construction for when one may look beyond the mere words of the statute: "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (9–0 decision).

*Robinson* is consistent with the observation of Justice Scalia, also writing for a unanimous Supreme Court, that the interpretation of the Bankruptcy Code "is a holistic endeavor" and that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (9–0 decision).

This implicates what is known as the doctrine of "whole statute" interpretation that we recently have described in connec-

tion with a different Bankruptcy Code co-nundrum. *Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*, 370 B.R. 236, 252 (9th Cir. BAP 2007); 2 A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTR. § 46:5 (5th ed.1992).

When one considers the "whole statute," paths toward a resolution more satisfactory to me emerge.

### III

One solution is based on a close reading of the provisions that implicate the term "current monthly income."

The context of § 1325(b) "disposable income" cannot be viewed in isolation from the definition of "current monthly income" at § 101(10A), and the adjustments to "current monthly income" and expenses provided by § 707(b). All three of these sections were added to the Bankruptcy Code as an integrated whole in 2005. Moreover, context requires consideration of the debtor's duty under § 521(a)(1)(B)(ii) to file "a schedule of current income and current expenditures," the basic requirements for chapter 13 plan confirmation under § 1325(a), and the provisions under § 1329 for modifying a plan after confirmation in order to account for changes in income.

### A

"Current monthly income" is a Code-wide defined term that focuses on the average of the debtor's income for six calendar months before bankruptcy. The definition specifically cross-references the debtor's § 521(a)(1)(B)(ii) duty to file a "schedule of current income and current expenses," which schedules have been required by § 521 since 1984 and are the "Schedules I and J" that figure in the § 1325(b) debate. The existence of this cross-reference is indicative of an intended interconnection between historical income and current income.

"Current monthly income" has its most prominent role at § 707(b) in connection with the statutory formula for determining whether a consumer debtor's case under chapter 7 is an "abuse" warranting dismissal or conversion to chapter 11 or 13. An elaborate mechanism is prescribed for computing the monthly expenses to be deducted from current monthly income.

Of particular interest in the present context is the mechanism in § 707(b) for rebutting the statutory presumption by demonstrating *"adjustments of current monthly income* for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B) (emphasis supplied). Such "adjustments of current monthly income" must be based on "special circumstances" and be "necessary and reasonable." The critical point for present purposes, however, is that there is a mechanism for adjusting "current monthly income" to reflect current circumstances so as to avoid unjust results.

It is perhaps natural that heretofore the "special circumstances" discussion has been focused on the expense side of the equation because that is where most of the action occurs. But the phrase "adjustments of current monthly income" must mean something because we do our best to try to give effect to all language in a statute. I submit that what is contemplated is a significant and not transitory change in income. The evidence supporting my view is in the language of § 707(b)(2)(B)(i): "special circumstances, such as . . . a call or order to active duty in the Armed Forces." One need only look at the official United States military pay tables to recognize that a call to active duty precipitates a substantial reduction in income for a typical military reservist consumer.

Although the calculations of current monthly income and monthly expenses required by § 101(10A) and § 707(b) appear in tableau format on Form B22A for chapter 7 cases and Form B22C for chapter 13 cases, the forms do not capture "special circumstances" adjustments to income. Since all the requirements of various versions of Form 22 (known as B22 in the interim preceding the effective date of the official Forms) are imposed directly or indirectly by the statute, the statute controls whenever Form 22 diverges from the statute. Indeed, the Forms 22 resulted from the mandate in § 707(b)(2)(C) that a statement of "current monthly income" and the calculations regarding the presumption of abuse be presented in conjunction with the schedules of current income and current expenses required by § 521. Since the statute authorizes "adjustments of current monthly income," the statement of "current monthly income" on a form that does not attempt to capture such adjustments does not mean that there cannot be "adjustments of current monthly income" to reflect reality when "special circumstances" exist.

"Current monthly income" and the § 707(b) abuse calculations spill over to the chapter 13 plan confirmation provisions under § 1325. Since 1984, a plan that satisfies the basic § 1325(a) plan confirmation standards nevertheless may not, by virtue of § 1325(b), be confirmed over objection of the chapter 13 trustee or the holder of an allowed unsecured claim unless either the objecting creditor is being paid in full or all of the debtor's "projected disposable income" is committed to the plan for the requisite period. 11 U.S.C. § 1325(b). Also since 1984, § 1325(b) has contained a definition of "disposable income," but until 2005 that definition focused on "income which is received by the debtor and which is not reasonably necessary to be expended" for maintenance and

support. 11 U.S.C. § 1325(b)(2) (repealed 2005).

The innovation in 2005 for § 1325(b)(2) came in two parts. First, the definition of "disposable income" was revised by substituting "current monthly income" in place of "income which is received by the debtor." The friction generated by the introduction of this disconnect between present and past ignited the present debate that seems to be boiling down to a disagreement about whether the word "projected" is an adjective applied to a term of art ("disposable income") or instead whether "projected" is part of an integrated term ("projected disposable income") with a meaning different than "disposable income."

The second facet of the 2005 revision of § 1325(b)(2) was the addition of the requirement in § 1325(b)(3) that allowable expenses under § 1325(b)(2) for over-median income debtors be "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." Of course, § 707(b)(2)(B) is precisely the provision that authorizes "adjustments of current monthly income" based on present facts. In other words, it is at least a plausible interpretation (I do not pretend it is perfect) that "current monthly income" as used in § 1325(b) can be adjusted under the mechanism provided by § 707(b)(2)(B) to recognize substantial and non-transitory changes in income.

It is no objection that § 1325(b)(3) applies only for over-median income debtors. The language is certainly mandatory for over-median income debtors ("Amounts reasonably necessary to be expended under paragraph (2) shall be determined . . ."), but a court presumably would have discretion (i.e. "may be determined") to apply similar analysis to other debtors. The more accurate view of § 1325(b)(3) is

that it is mandatory for over-median income debtors, but optional for under-median income debtors.

It is perhaps more of an objection that the incorporation of § 707(b)(2)(B) into § 1325(b)(3) is done in terms that refer only to the expense side of the equation. That would have some force if Congress had imported only § 707(b)(2)(A), which deals only with expenses. It loses force when one looks at the incorporation of § 707(b)(2)(B), which deals exclusively with rebutting a presumption of abuse (that can only arise after "current monthly income" netted with § 707(b)(2)(A) expenses). Since the presumption of abuse that is addressed by § 707(b)(2)(B) has literally nothing to do with chapter 13, the specific incorporation of § 707(b)(2)(B) into § 1325(b)(3) must mean that the provisions for making "adjustments" based on "special circumstances" is what is being imported without the irrelevant presumption of abuse rebuttal provisions. Congress must have meant something by specifying § 707(b)(2)(B); what else, besides "adjustment" safety valve, could it have been? It is difficult to imagine how only snippets of the special circumstances adjustments would be applicable. If this analysis were to be applied, then the problem presented by this appeal would be solved. The debtor has had a substantial and non-transitory increase in income that necessitates a § 707(b)(2)(B) "adjustment of current monthly income" based on "special circumstances" to an amount substantially higher than the $2,666.67 upon which he relied to propose a $10,822.20 plan. Hence, the court correctly sustained the § 1325(b) objection to confirmation and correctly dismissed the case when the debtor chose not to file another plan that took into account the appropriate "adjustments of current monthly income."

## B

Further support for the construction outlined above is found at § 1329(a), which provides for modification of a plan after confirmation.

At any time between confirmation and completion of payments under a chapter 13 plan, the debtor, the trustee, or an unsecured creditor may request a plan modification that, among other possibilities, increases or reduces payments or extends or reduces the time for making payments. 11 U.S.C. § 1329(a)(1). Such modifications typically are based on changes in income.

While a modification must meet the plan confirmation requirements of § 1325(a), which is incorporated by § 1329(b)(1) ("the requirements of section 1325(a) of this title apply to any modification under subsection (a)"), it is significant that § 1325(b) does not apply to § 1329 modifications. *Sunahara v. Burchard (In re Sunahara)*, 326 B.R. 768, 781–82 (9th Cir. BAP 2005).

In sum, the construction of the statute that discerns the ability to adjust "current monthly income" based on "special circumstances" is a plausible reading of the relevant provisions of the Bankruptcy Code and accounts for both upward and downward adjustments to "current monthly income."

## IV

An alternative basis upon which we could affirm this appeal focuses on the basic confirmation requirements specified by § 1325(a).

Accepting at face value the debtor's argument that the $10,822.20 he proposes to pay into the plan is all that he must do under § 1325(b), the plan nevertheless must meet all confirmation requirements of § 1325(a).

Since it is apparent that the debtor actually could afford to pay about $35,000 into

a plan during the applicable commitment period, the question becomes whether the plan has been "proposed in good faith" as required by § 1325(a)(3).

As we explained in *Sunahara,* the § 1325(a)(3) analysis, among other things, "necessarily requires an assessment of a debtor's overall financial condition including, without limitation, the debtor's current disposable income, the likelihood that the debtor's disposable income will significantly increase due to increased income or decreased expenses over the remaining term." *Sunahara,* 326 B.R. at 781–82.

When the record establishes that there is a material disparity between what would be paid into a plan and what could be paid into a plan, the question of what should be paid into a plan becomes part of the confirmation process. A tool in the toolbox for dealing with this situation is the "good faith" plan confirmation requirement.

It is credible to argue that the debtor's plan is an intentionally passive-aggressive, "gotcha" response to the straightjacket that was nominally imposed by the 2005 amendments. While to some it smacks of delicious irony, there is a point of degree at which a debtor's proposed chapter 13 plan can move into the realm of over-reaching that is lacking in "good faith."

In this context, it is significant that in the 2005 amendments Congress restated the requirement that debtors file a schedule of "current income and current expenditures" in cases under all chapters. 11 U.S.C. § 521(a)(1)(B)(ii). The provision that requires additional reporting of "current monthly income" in connection with the schedule of current income and current expenses appears only in chapter 7. 11 U.S.C. § 707(b)(2)(C).

Since Congress would not have required reporting of current information regarding income and expenses if such information was intended to be irrelevant, it follows that such information may be considered in the § 1325(a) "good faith" analysis required for chapter 13 plan confirmation.

Accordingly, the bankruptcy court's refusal to confirm the plan that would pay less then one-third of what the schedules of current income and expenses (Schedules I and J) suggest the debtor could pay, may be affirmed on the basis that the plan was not confirmable because the plan proponent did not by a preponderance of evidence establish that the plan was proposed in "good faith" as required by § 1325(a)(3).

This analysis, however, is less attractive than the analysis suggested above because it does not account for how one would deal with the debtor whose actual income has fallen below "current monthly income" in a manner that would permit an unsecured creditor animated by non-economic factors to block plan confirmation even though the debtor still has sufficient income to fund a chapter 13 plan and may desperately need to confirm such a plan in order to cure, for example, a mortgage default during the life of the plan.

\* \* \*

Both of these alternative theories would support affirmance and appear to me to be more firmly grounded in the language of the statute than the approach of cutting the Gordian Knot. As noted at the outset, however, if I had to choose between the majority's approach and the alternative that "current monthly income" creates a straightjacket in which there is no flexibility for dealing with the actual facts of a particular case, I would agree with the substantial body of cases that go with cutting the knot.

Accordingly, I concur.